Vincent James LANDANO,
Plaintiff-petitioner,

v.

John J. RAFFERTY, (Superintendent, East Jersey State Prison), Peter N. Perretti, Jr. (Attorney General, State of New Jersey), Defendants-respondents.

Civ. A. Nos. 85–4777, 89–2454.

United States District Court,
D. New Jersey.

July 27, 1989.

Neil Mullin, Nancy Erika Smith, Smith, Mullin & Kiernan, West Orange, N.J., for plaintiff-petitioner.

Richard W. Berg, Carol M. Henderson, Catherine A. Foddai, Deputy Attys. Gen., Div. of Crim. Justice, Appellate Section, Trenton, N.J., for defendants-respondents.

## OPINION

SAROKIN, District Judge.

### INTRODUCTION

We live in a Nation in which liberty is cherished second only to life itself. Society commits no greater wrong than to convict and confine (or execute) one who may be innocent of the crimes with which he or she has been charged. No greater responsibility is reposed in the federal judiciary than the review of convictions based upon alleged constitutional violations.

The writ of habeas corpus has served for centuries as the emancipator of those who have been wrongly accused or unfairly prosecuted in violation of the Constitution.

In its earlier opinion in this matter, the court stated:

The murder of a police officer is a tragic event, not only for the loss sustained by the officer's family, but because it is the ultimate symbol of lawlessness. That tragedy is compounded however, if there is a risk that an innocent person has been convicted of such a despicable crime. The record in this case demonstrates that there is just such a risk, but because of binding precedent this court is powerless to grant the relief which petitioner seeks and to which this court believes he is entitled.

*Landano v. Rafferty*, 670 F.Supp. 570, 571–72 (D.N.J.1987).

New information has been presented to the court which demonstrates that evidence which may have exculpated the petitioner and inculpated another had been systematically withheld from the petitioner and his counsel. That information, coupled with the matters set forth in the court's previous opinion, affords to the court the opportunity to render the justice to the petitioner which was previously denied.

Neither the death of a police officer nor the grief of his family is vindicated or ameliorated by the conviction of one who may be innocent. The scales of justice are rendered askew by the withholding of evidence which supports the innocence of the accused or the guilt of another. No one should be deprived of the precious gift of liberty under such circumstances.

This matter is before the court on petitioner's motion to reopen and vacate the court's prior denial of his petition for a writ of habeas corpus and petitioner's renewed request that the court issue a writ of habeas corpus.

As more fully set forth below, the court determines that this matter should be reopened pursuant to Fed.R.Civ.P. 60(b), that petitioner has satisfied the exhaustion requirement set forth in 28 U.S.C. 2254, and that the prosecutor's failure to disclose *Brady* material violated petitioner's due process rights and deprived him of a fair trial. Accordingly, a conditional writ of habeas corpus shall issue.

BACKGROUND

On August 13, 1976, two gunmen robbed the Hi–Way Check Cashing Service in Kearny, New Jersey.[1] During the robbery, one of the gunmen shot and killed a Newark police officer. A Hudson County grand jury indicted Landano and three other men, Allen Roller, Victor Forni, and Bruce Reen, for felony murder and other crimes stemming from the robbery. The trial of Forni and Reen was severed. Roller agreed to testify against Landano pursuant to a plea agreement.

The evidence at trial showed the crime was the work of a motorcycle gang called "The Breed," which frequently planned and executed armed robberies in the Staten Island area. Testimony at trial revealed that in June 1976, Allen Roller, president of The Breed's Staten Island chapter, together with Victor Forni, not a "Breed" member, but reputedly responsible for organizing most Breed criminal endeavors, conceived a plan to rob the Hi–Way Check Cashing Service which was owned and operated by Jacob Roth.

Though it was undisputed at trial that Landano was neither a Breed member nor a Breed affiliate, co-defendant Roller testified that Landano had been specifically recruited for this job. Roller admitted that Forni and not Landano was responsible for orchestrating the Kearny robbery, but Roller vigorously denied Forni's participation in the crime's execution. Roller testified that Landano was a longstanding friend of Forni's and that Forni had suggested recruiting Landano for this job.

In the early morning hours of August 13, 1976, Allen Roller together with a "dark-haired" accomplice, who Roller identified as Landano, arrived at Roth's check cashing service. Roller testified that he entered the trailer that housed the service

1. This account of the underlying crime and the trial proceedings is summarized from prior opinions of this court and the Third Circuit Court of Appeals in this matter. *See Landano v. Rafferty*, 670 F.Supp. 570, 573–75 (D.N.J.1987), *aff'd*, 856 F.2d 569, 570–71 (3d Cir.1988).

and proceeded to steal the available cash while his partner remained outside.

During this time, a Newark patrol car driven by Patrolman John Snow arrived in the Hi–Way Check Cashing Service parking lot. Officer Snow had in his possession an attache case containing $46,000 in cash intended for delivery to Hi–Way Checking. Joseph Pascuiti, an employee of a nearby warehouse, testified that he saw a dark-haired man approach the police car and raise a gun toward the officer inside. When Pascuiti turned away to call for help, he heard several gunshots. Turning back to the parking lot, he saw a green Chevrolet, driven by the dark-haired perpetrator, pulling away. At trial, Pascuiti was not able to identify Landano as the dark-haired triggerman.

Roller testified that he and Landano sped away from the crime scene, with Landano driving and Roller in the back seat. According to Roller, Landano confessed upon return to the car that he had had to "ice [or waste] the cop". Having escaped the crime scene, the getaway car soon came upon a traffic jam. The driver's frantic attempts to maneuver around a blocked intersection drew the attention of Raymond Portas, a truck driver whose truck was stopped at the intersection. Though Portas was unable to identify Roller as the vehicle's passenger, his description of the license number of the vehicle matched the number given by Roth, and he testified at trial that Landano was the driver of the car.

The evidence presented at trial included Roller's testimony naming Landano as his partner in crime, Pascuiti's testimony that the dark-haired man who shot Officer Snow was also the driver of the getaway car, and Portas' identification of Landano as the driver of the vehicle identified as the getaway car.

After the jury returned a verdict finding Landano guilty on all counts, he was sentenced to life imprisonment on the felony murder count and a consecutive term of seven to fifteen years on the remaining counts. Landano sought reversal of his conviction in state appellate and post-conviction proceedings, to no avail. Landano thereafter filed a petition for a writ of habeas corpus in this court pursuant to 28 U.S.C. Section 2254.

On September 29, 1987, this court issued an opinion and order, denying Landano's petition for habeas corpus relief. *Landano v. Rafferty*, 670 F.Supp. 570 (D.N.J. 1987). In that action, Landano contended that he was entitled to habeas corpus relief because (1) his due process rights to a fair trial were infringed by the admission of Raymond Portas' identification testimony; (2) the state unlawfully suppressed exculpatory and material evidence that would have impeached the testimony of two trial witnesses, Allen Roller and Jacob Roth; and (3) the state court's coercive charge to the jury violated his Sixth Amendment right to an impartial jury. *Id.* at 573.

The court held that, although it found that Raymond Portas' recantation was credible, it was bound by the state court's factual determinations regarding the lack of credibility of Portas' recantation of his trial testimony and that, on the basis of the state court's factual findings, the court could not conclude that the admission of Portas' identification testimony violated Landano's due process rights. *Id.* at 583. In addition, the court held that although exculpatory evidence relevant to the impeachment of Roller and Roth was wrongfully suppressed by the state, the evidence suppressed was not "material" to the outcome of the trial in light of the other evidence against Landano. *Id.* at 586, 588. The "other" evidence consisted of Pascuiti's testimony that the dark-haired man who shot Officer Snow was also the driver of the getaway car and Portas' identification of Landano as the driver of the getaway car. In other words, the testimony of Pascuiti and Portas, taken together, compelled this court to conclude that there was no reasonable probability that an acquittal would have resulted had the prosecutor not suppressed evidence with respect to the impeachment of Roller and Roth. Finally, the court held that the *Allen* charge given by the trial court was not so coercive as to have deprived petitioner of a fair trial and the right to a unanimous jury. *Id.* at 590.

In December of 1987, the court denied petitioner's motion for reconsideration of its September 29, 1987 order, *Landano v. Rafferty,* 675 F.Supp. 204 (D.N.J.1987), and the Third Circuit affirmed the court's denial of Landano's habeas corpus petition. *Landano v. Rafferty,* 856 F.2d 569 (3d Cir.1988). The Supreme Court of the United States denied *certiorari. Landano v. Rafferty,* —— U.S. ——, 109 S.Ct. 1127, 103 L.Ed.2d 189 (1989).

On June 8, 1989, after considering Landano's *ex parte* application, this court entered a temporary restraining order directing the United States Marshal to seize and bring to this court files relating to the prosecution of Landano, Forni, Roller, or Reen maintained by the New Jersey Attorney General, the Hudson County Prosecutor, and several police departments. The government's claim of work product privilege with respect to certain materials was rejected by the court on June 15, 1989. After the government filed a notice of appeal from both orders, the Third Circuit Court of Appeals (per Greenberg, J.) granted a stay pending appeal with respect to this court's order of June 15, 1989.

Landano thereafter filed an Order to Show Cause why a writ of habeas corpus should not issue. Landano also moved to enjoin the State from retrying Landano for any crimes associated with the robbery of Hi–Way Check Cashing and the murder of John Snow on August 13, 1976. After receiving submissions from each side, the court heard oral argument on July 10, 1989.

## DISCUSSION

### I. Rule 60(b) Relief

■ Landano first argues that the order of this court of September 29, 1987, denying his application for habeas corpus relief, should be reopened and vacated pursuant to Fed.R.Civ.P. 60(b), which provides for relief from a final judgment. Because the prior judgment of the court has since been affirmed by the Third Circuit, the court must first address its authority to consider plaintiff's application.

In *Standard Oil Co. of California v. United States,* 429 U.S. 17, 18–19, 97 S.Ct.

31, 32, 50 L.Ed.2d 21 (1976), the grant of an injunction had been summarily affirmed by the Supreme Court. The movant sought to have the judgment set aside on the basis of misconduct by counsel for the government and by a material witness. Before filing a Rule 60(b) motion, the movant sought leave from the Court to proceed in the district court. The Supreme Court held that the district court could entertain the Rule 60(b) motion without leave of the Court, stating:

> In our view, the arguments in favor of requiring appellate leave are unpersuasive. Like the original district court judgment, the appellate mandate relates to the record and issues then before the court, and does not purport to deal with possible later events. Hence, the district judge is not flouting the mandate by acting on the motion.... The appellate-leave requirement adds to the delay and expense of litigation and also burdens the increasingly scarce time of the federal appellate courts. We see no reason to continue the existence of this "unnecessary and undesirable clog on the proceedings."

*Id.* at 18–19, 97 S.Ct. at 32, quoting *S.C. Johnson & Son, Inc. v. Johnson,* 175 F.2d 176, 184 (2d Cir.1949) (Clark, J., dissenting), *cert. denied,* 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949).

Since the *Standard Oil* decision, the Third Circuit has only refused to permit the reopening of a previously-affirmed judgment where the same facts or arguments in support of reopening the judgment were previously before the court of appeals or where newly asserted facts or arguments would not have affected the court's affirmance even had they been asserted earlier. Thus, in *Kock v. Government of the Virgin Islands,* 811 F.2d 240, 245–246 (3d Cir. 1987), the court held that the district court could not reopen the prior judgment pursuant to Rule 60(b)(6), because the new fact alleged did not go to the rationale upon which the court's affirmance had been based. In other words, the new fact could not be a "reason justifying relief" under the terms of Rule 60(b)(6), since it was not relevant to the court's reasons for affirm-

ing the first decision. *See also Seese v. Volkswagenwerk, A.G.,* 679 F.2d 336, 337 (3d Cir.1982) (where matter had been included or includable in prior appeal, it could not be the basis for Rule 60(b) relief).

However, in *Sellers v. General Motors Corp.,* 735 F.2d 68, 69 (3d Cir.1984), the court reaffirmed the ability of the district court to consider Rule 60(b) relief even where a prior ruling had been affirmed by the Court of Appeals. In *Sellers,* the court affirmed a judgment of the district court and denied a request for a remand to consider new evidence which had been fraudulently concealed by the defendants. When the plaintiff later moved for Rule 60(b) relief, the district court denied the motion on the grounds that the Third Circuit's denial of the request for remand was the "law of the case" and precluded consideration of the new evidence. The Third Circuit reversed, holding that the denial of the remand request

> established no more than that we would decide the pending appeal on the record made in the district court prior to the filing of the notice of appeal. Our affirmance on that record did not limit the power of the district court to consider Rule 60(b) relief.

*Id.* at 69. *See also Schiavone v. Fortune,* 750 F.2d 15, 19 (3d Cir.1984).

In the present case, the contentions made by Landano in support of his request for Rule 60(b) relief rely upon matters which were not and could not have been a part of the record before the Court of Appeals, and thus it is appropriate for the court to consider plaintiff's motion. This court initially denied habeas relief even though it found suppression of evidence relevant to the impeachment of Roller and Roth because it concluded that the suppressed evidence was not material in light of the other facts adduced at trial. Had the court known of other incidences of suppression which would cast doubt on the remaining facts supporting Landano's conviction, its assessment of the materiality of the suppressed evidence, and thus its conclusion that no constitutional violation occurred, may have

differed. The Third Circuit's affirmance of this court's denial of habeas corpus relief to Landano also relied on the existence of sufficient evidence, even without the testimony of Roller and Roth, to support Landano's conviction. *Landano,* 856 F.2d at 573–574. Both this court's and the Third Circuit's decisions were based in part on the assumption that other evidence introduced during the trial was a sufficient basis for the jury to have convicted Landano, and the evidence presented by Landano in support of his Rule 60(b) motion now calls that assumption into question. Although the issue of the suppression of exculpatory evidence was before the Third Circuit on appeal, the facts essential to a materiality determination which are presented here were *not* before the Third Circuit at that time. Thus, it is appropriate for this court to reopen the matter to consider its prior ruling in light of the newly asserted facts without petitioner having first obtained leave of the Third Circuit.

The court must next address the appropriateness of the application of Rule 60(b) in habeas corpus proceedings. Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Corpus Rules") states:

> The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied, when appropriate, to petitions filed under these rules.

The court concludes that, at least in the context of the present case, the application of Rule 60(b) would not be inconsistent with the Habeas Corpus Rules.

In *Pitchess v. Davis,* 421 U.S. 482, 489, 95 S.Ct. 1748, 1752, 44 L.Ed.2d 317 (1975) (per curiam), the Supreme Court held that Rule 60(b) may not be applied in habeas corpus proceedings where its application would serve to interfere with the exhaustion requirements of 28 U.S.C. Sec. 2254. However, the Court's opinion does imply that, where the exhaustion requirement has been met, Rule 60(b) may be applied in the context of a habeas corpus action.[2]

**2.** Since the court concludes *infra* at 644 that the exhaustion requirement has been met, *Pitchess*

Although the Third Circuit has not ruled on the question, Chief Judge Gibbons has stated that Rule 60 applies to habeas corpus proceedings. *Kravitz v. Commonwealth of Pennsylvania,* 546 F.2d 1100, 1104 (3d Cir.1977) (Gibbons, J., dissenting). In *Kravitz,* the majority held that the court had no jurisdiction over a second habeas corpus action because the petitioner was no longer in custody. Judge Gibbons dissented, stating that since Rule 60(b) relief was available with respect to the first habeas proceeding, dismissing the second habeas action on jurisdictional grounds was not necessary. In fact, two months after the Third Circuit's decision in *Kravitz,* the petitioner moved for Rule 60(b)(6) relief with respect to the denial of her first habeas petition, and the district court ultimately granted her motion to reopen the prior habeas. *In re Kravitz,* 471 F.Supp. 665 (M.D.Pa.1979). *See also Zeigler v. Wainwright,* 805 F.2d 1422 (11th Cir.1986).

Habeas Corpus Rule 9(b) permits successive petitions for habeas corpus relief unless the court concludes that the ends of justice would not be served by consideration of the petition. *Cf. Sanders v. United States,* 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963) ("[c]onventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged," *id.* at 8, 83 S.Ct. at 1073). The Third Circuit has stated that, in the context of a habeas corpus proceeding, a bar to Rule 60(b) relief would "serve only delay, not finality." *Burkett v. Cunningham,* 826 F.2d 1208, 1217 n. 26 (3d Cir.1987). Thus, entertaining a Rule 60(b) motion after entry of an order dismissing plaintiff's first habeas petition would not necessarily be inconsistent with the Habeas Corpus Rules and would prevent the delay inherently involved in the filing of a second petition. *See, e.g., Matarese v. LeFevre,* 801 F.2d 98, 106 (2d Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). *Cf. Harris v. Nelson,* 394 U.S. 286, 291, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1969) ("[t]he scope and flexibility of the

does not preclude the court from considering

[habeas corpus] writ ... its ability to cut through barriers of form and procedural mazes—have always been emphasized and jealously guarded by courts and lawmakers").

■ Rule 60(b) provides, in relevant part:

On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.... This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding, ... or to set aside a judgment for fraud upon the court....

Although Landano's motion is based upon Rule 60(b) in general terms rather than upon any specific subsection of the rule, he primarily argues that the court's judgment should be set aside as a result of the State's alleged fraud upon the court in the prior habeas proceedings.

■ Landano correctly asserts that the court is empowered to vacate a judgment if it was obtained through a fraud upon the court. *See, e.g., Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946); *Hazel–Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238, 250–51, 64 S.Ct. 997, 1003, 88 L.Ed. 1250 (1944); *Virgin Islands Housing Authority v. David,* 823 F.2d 764, 766 (3d Cir.1987). A fraud on the court may be found to have been committed when an officer of the court misleads the court either intentionally or with cal-

Landano's Rule 60(b) application.

lous disregard for the truth, where such misrepresentation disrupts the court's ability to fairly render a decision. *See Virgin Islands Housing Authority*, 823 F.2d at 767, citing *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1119 (6th Cir.1976).

Despite Landano's allegations of a commission of a fraud on the court by the Deputy Attorney General, the court is convinced that any misstatements by D.A.G. Schwartz were not made for the purpose of deceiving either plaintiff or this court. She was given the specific task of locating any photographs or other documents indicating that Portas identified Forni, and her certification that no such photographs or documents were in the prosecutor's file was accurate. Given the nature of plaintiff's claims in the prior habeas proceedings, D.A.G. Schwartz perhaps ought to have disclosed the items in the files which are now at issue, but the court's order did not clearly obligate her to do so. In addition, the State asserts that it had no reason to believe that the Hudson County Prosecutor had not turned over any and all exculpatory materials in the files prior to the original trial. (*See* Brief on Behalf of Defendants in Opposition to Order to Show Cause [hereinafter "Government Brief"] at 12).

In order for the court to conclude that a fraud on the court was committed, it would have to find some element of fraudulent intent on the part of the Attorney General's Office in failing to reveal the items in the file at issue and in D.A.G. Schwartz' representations to the court. These are serious allegations and the court necessarily would require a strong showing by the plaintiff that such intent existed before finding that a fraud on the court has been committed. On the record before it, the court cannot conclude that the Attorney General's office or D.A.G. Schwartz acted in bad faith or with any fraudulent intent.

Thus, the court concludes that Landano has failed to demonstrate an independent basis for reopening his prior habeas proceeding based upon his allegations that a fraud was committed upon this court. However, the court must next evaluate the appropriateness of reopening the judgment pursuant to the specific subsections of Rule 60(b), as opposed to the "savings clause" of that rule which permits reopening of judgments based upon independent claims of fraud on the court.

Motions under Rule 60(b) are addressed to the sound discretion of the court. *Ross v. Meagan*, 638 F.2d 646, 648-9 (3d Cir. 1981). Relief under subsections (1), (2), and (3) is not available to plaintiff, because motions under those subsections must be brought within one year of the entry of the order or judgment from which relief is sought. Fed.R.Civ.P. 60(b). However, the court concludes that the circumstances under which Landano now seeks relief are sufficiently extraordinary for relief to be granted under Rule 60(b)(6).

The Supreme Court has held that relief is available under Rule 60(b)(6) when "something more" than what is required under subsections (1) through (5) is shown. *Klapprott v. United States*, 335 U.S. 601, 613, 69 S.Ct. 384, 389, 93 L.Ed. 266 (1949). This extra element has been described as "a more compelling showing of inequity or hardship" than what the other subsections of the rule require. *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1140 (D.C.Cir.1988). Thus, Rule 60(b)(6) is applicable when the party seeking relief is able to demonstrate that the reason for relief is not embraced within the provisions of subsections (1) through (5) and that exceptional circumstances exist which warrant relief. *See, e.g., Ackermann v. United States*, 340 U.S. 193, 199, 71 S.Ct. 209, 212, 95 L.Ed. 207 (1950) (extraordinary circumstances required for Rule 60(b)(6) relief); *Stradley v. Cortez*, 518 F.2d 488, 493 (3d Cir.1975) (Rule 60(b)(6) requires extraordinary circumstances and more than the reasons expressed in subsections (1) through (5)); *John E. Smith's Sons Co. v. Lattimer Foundry & Machine Co.*, 239 F.2d 815, 817 (3d Cir.1956).

Landano's request to reopen the court's prior judgment in this case cannot be characterized as simply being based upon newly discovered evidence pursuant to Rule 60(b)(2) or upon the misconduct of

an adverse party pursuant to Rule 60(b)(3). Landano alleges that exculpatory evidence was suppressed by the State during all stages of his prosecution and post-conviction appeals and that this evidence was only recently discovered by him through continued investigation by his counsel.[3] Landano's allegations are not simply that there was misconduct by the prosecution or that he inadvertently discovered new evidence; rather, he claims that his constitutional right to the disclosure of exculpatory evidence was violated by the failure of the prosecution to turn over certain items in its possession and control. This is not merely a matter of reopening a money judgment in a civil action—the petitioner's liberty is at stake. The court concludes that "something more" than what is required under the provisions of subsections (1) through (5) has been demonstrated by Landano and thus that his request to reopen the prior ruling of this court is properly considered under the provisions of subsection (6), which covers "any other reason justifying relief."

A review of the cases which have considered whether circumstances are sufficiently "extraordinary" for Rule 60(b)(6) relief to be available shows that the present action is one in which Rule 60(b)(6) relief is particularly appropriate.

In *Klapprott, supra,* the Supreme Court held that a default judgment which stripped the petitioner of citizenship was properly vacated under Rule 60(b)(6) when, at the time of the judgment, the petitioner was incarcerated, was facing medical and financial hardships, and was acting *pro se.* In *Ackermann, supra,* another case involving denaturalization, the Court held that Rule 60(b)(6) relief is appropriate where "exceptional circumstances," such as those in *Klapprott,* are present. However, the Court held that such exceptional circumstances did not exist in *Ackermann,* because the petitioner had been represented by counsel at the denaturalization proceedings and had voluntarily chosen not to appeal the decision. Thus, *Ackermann* is distinguished from *Klapprott* by the fault of the petitioner in *Ackermann* in failing to timely assert his grounds for relief on direct appeal.

The leading Third Circuit decision in which the circumstances were deemed to be "exceptional" and thus to warrant Rule 60(b)(6) relief is *Boughner v. Secretary of Health, Education & Welfare,* 572 F.2d 976 (3d Cir.1978). In that case, plaintiffs' attorney failed to file opposition to summary judgment motions and the motions were granted as unopposed. The attorney had been involved in a campaign for a judgeship, his secretary had left, and he had a large backload of cases; so large, in fact, that at the time over fifty motions against his clients were left unopposed. The court held that these facts demonstrated "neglect so gross that it is inexcusable," *id.* at 978, and concluded that the requirements of Rule 60(b)(6) had been met. The court stated:

> In reaching our decision that the circumstances here are sufficiently exceptional and extraordinary so as to mandate relief pursuant to Rule 60(b)(6), we are not unmindful of the need for judicial eagerness to expedite cases, to fully utilize the court's time, to reduce overcrowded calendars and to establish finality of judgments. However, these commendable aspirations should never be used to thwart the objectives of the blind goddess.

*Id.* at 978–79. *See also United States v. Cirami,* 563 F.2d 26 (2d Cir.1977) (holding Rule 60(b)(6) relief appropriate where more than "mere neglect" was shown by attorney, who suffered mental disorder).

Although the court did not determine which subsection of Rule 60(b) was applicable to its decision, the Third Circuit held in *Burkett v. Cunningham,* 826 F.2d 1208 (3d Cir.1987), that exceptional circumstanc-

---

**3.** Rule 60(b) also requires that motions for relief under the rule be brought within a "reasonable time". What constitutes a "reasonable time" under the rule is to be decided under the circumstances of each case. *Delzona Corp. v. Sacks,* 265 F.2d 157, 159 (3d Cir.1959). Given that the petitioner only recently became aware with any particularity of the exculpatory evidence set forth in the present application, the court concludes that the present motion was brought within a "reasonable time" pursuant to Rule 60(b).

es justifying relief under Rule 60(b) existed. The court emphasized that

> Burkett was a diligent, incarcerated habeas petitioner, repeatedly transferred from jail to jail; that affirmative behavior of the court induced him to await notification by the court for a reasonable length of time; that he learned of the entry of judgment too late to apply for relief under Rule 4(a)(5); that he promptly sought relief under Rule 60(b) within 30 days of learning of the entry of judgment; and that respondents have shown no prejudice.

*Id.* at 1217. Thus, at least for the purposes of extending the time to appeal, where a petitioner has been diligent and not at fault with respect to the need to reopen a judgment, Rule 60(b) relief is appropriate.

■ In *Moolenaar v. Government of the Virgin Islands,* 822 F.2d 1342 (3d Cir. 1987), two years after a judgment had been entered the plaintiff moved to reopen based on newly discovered evidence and inadequate representation of counsel. The action had involved the question of whether certain property was covered under a lease from the government to plaintiffs, and the plaintiffs' attorney had possessed but not presented evidence that the property *had* been intended to be included in the lease. The court held that the circumstances were not extraordinary enough for Rule 60(b)(6) relief, stating: "the present case does not present any extraordinary circumstances. The Moolenaars simply failed to present evidence which was available to them from the outset." *Id.* at 1347. However, the Third Circuit distinguished *Chicago & E. Ill. Railroad v. Illinois Central Railroad,* 261 F.Supp. 289 (N.D.Ill.1966), a case which, according to the court, clearly presented extraordinary circumstances. The Third Circuit indicated that in *Illinois Central Railroad* the court, not the parties themselves, had been responsible for the failure to present evidence which had been available at the original hearing. Thus, Rule 60(b)(6) relief is not appropriate if the evidence in support of reopening the judgment was available at the time of the original proceedings. Such relief may be available, however, if the failure to present such

evidence is not the fault of the party seeking to reopen the judgment.

■ In addition, the court has held that Rule 60(b)(6) relief is not available if it serves merely as a substitute for appeal. As the Third Circuit stated in *Martinez–McBean v. Government of the Virgin Islands,* 562 F.2d 908, 911 (3d Cir.1977), "it is improper to grant relief under Rule 60(b)(6) if the aggrieved party could have reasonably sought the same relief by means of appeal." (Citations omitted.) In that case, the district court had, on its own motion, reexamined its prior ruling over two years after it had been entered and concluded that an error of law had been made. The Third Circuit found that the *pro se* plaintiff had understood his ability to appeal the district court's ruling and had failed to do so, and thus that it had been an abuse of discretion to grant Rule 60(b)(6) relief. *See also Ackermann, supra,* at 198, 71 S.Ct. at 211; *In re Fine Paper Antitrust Litigation,* 840 F.2d 188, 194–95 (3d Cir.1988).

In the present action, Landano clearly is not attempting to use Rule 60(b)(6) as a substitute for appeal, since the court's original judgment was the subject of a timely appeal. In addition, the facts asserted by Landano in his motion to reopen were clearly unavailable to petitioner during the original habeas corpus hearing. Although these facts were available to defendants, they were not presented to the court and the failure to present them was due entirely to the fault of the prosecution in suppressing the evidence during the state court proceedings and thereafter. If the gross negligence of the party's own counsel is grounds for Rule 60(b)(6) relief, as in *Boughner, supra,* then surely the suppression of evidence by the State in violation of a criminal defendant's constitutional rights, in combination with the absence of traditional notions of finality in habeas corpus proceedings, is sufficient to warrant the application of Rule 60(b)(6) to this action.

The failure to consider Landano's Rule 60(b) motion would certainly result in prejudice to plaintiff, since any delay in reaching the merits of his petition is inherently

prejudicial while Landano remains incarcerated. In contrast, very little, if any, prejudice can be asserted by the State, since the Habeas Corpus Rules permit successive petitions and thus the State must always be prepared to respond to new demands for habeas corpus relief.

 The court's discretion in deciding motions under Rule 60(b) is predicated upon serving the interests of justice. The court cannot conceive of circumstances more "extraordinary" than those presented here, where a prisoner presents evidence that he was convicted without the benefit of exculpatory evidence and that such evidence was not available to him until the time of his motion for relief under Rule 60(b) because of the failure of the State to meet its obligation to turn over such evidence. Landano should not be deprived of the opportunity to present evidence of the suppression of exculpatory materials simply because the State successfully suppressed such evidence until after his habeas corpus application was heard and decided by this court. The court will grant Landano's motion to reopen the court's prior judgment pursuant to Rule 60(b)(6).

## II. Exhaustion of State Remedies

 As a second threshold matter, the court must address the government's contention that Landano has circumvented his obligation to exhaust available state remedies before seeking collateral relief in this court. The exhaustion requirement, which is codified at 28 U.S.C. Section 2254(b), seeks to afford state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary. *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S.Ct. 617, 620, 88 L.Ed.2d 598 (1986). The doctrine is principally designed to protect the state courts' role in the enforcement of federal law and to prevent disruption of state judicial proceedings. *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982). *See Duckworth v. Serrano*, 454 U.S. 1, 2, 102 S.Ct. 18, 18, 70 L.Ed.2d 1 (1981) (per curiam) (noting that the exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights"). In general, a "mixed" petition containing both exhausted and unexhausted claims must be dismissed. *Rose, supra*, 455 U.S. at 519, 102 S.Ct. at 1203.

Although the rule is one of careful discretion rather than of jurisdiction, *see, e.g., Bond v. Fulcomer*, 864 F.2d 306, 309 (3d Cir.1989), the Third Circuit has instructed that it "is not a mere formality." *Gibson v. Scheidemantel*, 805 F.2d 135, 138 (3d Cir.1986).

The Supreme Court and the Third Circuit have set forth the following standards to guide the determination of whether a habeas petitioner has satisfied the exhaustion requirement. In *Picard v. Connor*, 404 U.S. 270, 275–78, 92 S.Ct. 509, 512–14, 30 L.Ed.2d 438 (1971), the Supreme Court stated that once the "substance" of the federal claim has been "fairly presented" to the state courts, the exhaustion requirement is satisfied. Subsequent Third Circuit decisions have further delineated the "fair presentation" requirement. First, the "method of analysis" asserted in the federal court must have been "readily available to the state court." *Zicarelli v. Gray*, 543 F.2d 466, 472 (3d Cir.1976) (en banc) (quoting *Stanley v. Illinois*, 405 U.S. 645, 658 n. 10, 92 S.Ct. 1208, 1216 n. 10, 31 L.Ed.2d 551).

Second, the substance of the claim asserted in state court must be indistinguishable from the claim asserted in the federal court. *See Bisaccia v. Attorney General of State of New Jersey*, 623 F.2d 307, 312 (3d Cir.1980), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980) (because substance of due process claim presented to state court was "virtually indistinguishable" from federal claim, *Picard* test for exhaustion met); *see also Zicarelli, supra* (sixth amendment claim based on venue is not equivalent to sixth amendment claim based on fair cross-section analysis).

Third, the petitioner must have presented to the state courts both the legal theory and the facts on which the legal claim

rests. *Gibson, supra. Compare Chaussard v. Fulcomer,* 816 F.2d 925, 928–29 (3d Cir.1987), *cert. denied,* 484 U.S. 845, 108 S.Ct. 139, 98 L.Ed.2d 96 (1987) (argument section in petitioner's brief in state Supreme Court proceeding, which relied on federal constitutional cases and asserted that prosecutor's knowing use of perjured testimony violated fourteenth amendment and due process clause, fairly presented federal claim to state courts) *with Zicarelli, supra,* at 474 (mere reference by defendant's counsel to an opinion containing a constitutional claim did not fairly present sixth amendment cross-section issue to the state courts).

■ In this case, an order of this court has enabled Landano to discover and present facts not heretofore available to him. A failure to make every factual argument in state court to support a federal claim does not constitute a failure to exhaust. *See Patterson v. Cuyler,* 729 F.2d 925, 929 (3d Cir.1984) [4]; *see also Bright v. Williams,* 817 F.2d 1562, 1565 (11th Cir. 1987) (once petitioner places legal theory and supporting facts before state court, he is not precluded from raising additional facts in support of claim in federal habeas petition, citing *Patterson* ); *Zicarelli, supra,* at 474, n. 31 ("[w]ithin the contours of a particular argument ... not every detail need have been put before the state court in order to present all facets of the argument to the federal court on a petition for habeas") (citation omitted). This court must determine whether the new facts presented by Landano fundamentally alter the legal claim already considered by the state courts. *Vasquez, supra,* at 260.

The government argues that Landano has not exhausted his available state remedies with respect to his claims arising out of evidence recently discovered in the files of the Hudson County Prosecutor and several police departments. For the first time, Landano asserts the following facts: (1) a photograph of Victor Forni was selected by

eyewitnesses named Basapas or Pasapas and Christopher Calabrese, and Landano was never so informed; (2) two eyewitnesses, including Joseph Pascuiti whose testimony was critical to the prosecution, observed a photograph of Landano and told investigators that he was *not* the man they saw on the day of the crime, and Landano was never so informed; (3) an unknown investigator reported an unknown eyewitness as having identified Victor Forni as the driver of the getaway car; this report was written on the outside of a Hudson County Prosecutor's envelope with references to three photographs, none of which are contained in the envelope, and Landano was never so informed; and (4) the government has failed to preserve other evidence, including photographs used in displays and fingerprint reports.

The government concedes that Landano has exhausted his claims with respect to (1) whether the prosecution suppressed exculpatory evidence showing that Raymond Portas selected a photograph of Victor Forni; (2) whether the prosecution suppressed exculpatory evidence showing that prosecution witness Jacob Roth was coerced into identifying Landano; (3) whether the prosecution suppressed exculpatory evidence relating to the involvement of Officer Snow's son in the Breed, the motorcycle gang which was linked to the robbery and murder.

The government also concedes that Landano asserted "in general terms" that the state had fabricated evidence against him and suppressed evidence against Forni. However, the government insists that the assertion of this "general theory" does not satisfy the exhaustion requirement. The government catalogs each discrete issue raised in the state courts with respect to prosecutorial misconduct. In the government's view, Landano focused on misconduct regarding the identifications made by Roth and Portas, and other crimes evidence with respect to co-defendant Allen Roller. The government argues that none of these

---

**4.** *Patterson's* separate holding, that 28 U.S.C. Section 2254(d)'s presumption of factual correctness applies to mixed questions of law and fact was "effectively overruled" by *Miller v. Fenton,* 474 U.S. 104, 108 n. 3, 106 S.Ct. 445, 448 n. 3, 88 L.Ed.2d 405 (1985). *Carter v. Rafferty,* 826 F.2d 1299, 1306 n. 2.

issues related to the Basapas/Pasapas and Calabrese identifications or the other newly discovered evidence now before this court. Specifically, the government argues that Landano's prior claims regarding witness identifications of Forni were restricted to such an identification by Portas and no one else. Moreover, the government contends that Landano's claim necessarily requires a determination of whether certain documents were turned over to defense counsel. In the government's view, the state courts should be given the first opportunity to decide that factual issue.

Landano contends that he consistently raised in the state courts the legal claim that the state suppressed inculpatory evidence with respect to Forni and that the state fabricated evidence implicating Landano. Specifically, Landano insists that he argued in the state courts that the state suppressed evidence of Forni's role as an active, rather than conspiratorial, participant in the murder of Officer Snow.

In support of this contention, Landano offers the following excerpts from his Brief in Support of Petition for Post–Conviction Relief, submitted to the state courts in 1981:

... the Court will find the following factual pattern emerging—a pattern that explains the pressure brought to bear on Portas and Roth and that involves the most blatant violation of petitioner's constitutional rights:

—Within days of the crime, New Jersey police, working in cooperation with other agencies including the FBI, focused their attention on a group of individuals associated with a motorcycle gang known as the Breed, as suspects in the crime.

—Three such suspects were Allen Roller, Victor Forni, and Bruce Reen. All were associated with the Breed.

—One such suspect, Victor Forni, fit the physical description offered by eyewitnesses of the man who shot and killed Officer Snow. Evidence suppressed by the prosecutor and offered by the defense as the basis for a previous motion for a new trial reveals that Forni was suspected by New Jersey authorities of having actively participated with the Breed in armed robberies prior to the Kearny incident. A gun traced to Forni was used to kill Snow.

—When Allen Roller, a former president of the Breed, was apprehended, he implicated the petitioner, Mr. Landano, as the killer of Officer Snow in an effort to protect the true perpetrator, someone within the Breed; Landano had no association with that gang and never knew Roller. At trial, Roller admitted that the Breed visited violence on Breed associates who implicate others in crimes.

—Physical and eyewitness testimony did not support Roller's claim that Landano was the killer. He had neither a pencil-thin mustache nor a full head of curly hair on the day of the crime—two physical characteristics attributed by relevant eyewitnesses to the killer. Rather, he had straight hair and a full bushy mustache.

—Forni was apprehended in New York City.

—Landano, too, was arrested in New York City.

—Forni's lawyer successfully fought extradition for approximately two years. Landano was almost immediately extradited; a partially forged affidavit was used by the prosecutor as part of his successful effort to extradite Landano.

—The prosecutor was under tremendous pressure to obtain a rapid conviction of the killer of Officer Snow. Forni, the key suspect, was unavailable. Mr. Landano became the target of the investigation.

—Eyewitnesses were pressured, cajoled, or led into identification of Mr. Landano. In some cases no record was made of eyewitness identification of Forni.

—Ultimately, a conviction was obtained on the basis of such constitutionally defective eyewitness testimony.

—The prosecutor's efforts to overreach for a conviction of Mr. Landano merged neatly with the Breed's efforts to frame him in order to protect the Breed perpetrators.

No conviction should be allowed to stand on such a record.

(Mullin Cert., Exhibit R). Landano also points to other portions of the brief which argued that procedures used in securing Portas' identification violated federal and state law, citing, among other cases, *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Landano maintains that he raised the issue of suppression of evidence of Forni's guilt in federal due process terms at the State post-conviction hearing.

Landano also submits that he attempted to obtain further factual support for his contentions through discovery requests which were, in large part, denied by the state courts. Notably, Landano sought to depose Prosecutor Mulcahy; this request was denied. (Mullin Cert., Exhibit S). Landano argues that the documents now before this court would have been discovered had the state court permitted him to take the prosecutor's deposition.

In Landano's petition for certification to the New Jersey Supreme Court, he argued as follows:

> ... Mr. Landano has made a very substantial claim of innocence. It emerges from facts surrounding this case that the actual murderer of Officer Snow was a co-defendant, Victor Forni; that the prosecutor was unable to extradite Mr. Forni from New York at a time when the prosecutor's office was under enormous pressure to obtain a conviction for the killing of Police Officer John Snow; and that the prosecution, yielding to such pressure, joined the perpetrators of this crime in framing Mr. Landano as the alleged killer of Officer Snow.... This case provides an opportunity to give its imprimatur to the Appellate Divisions's very important ruling in *State v. Thomas* ... holding that an accumulation of prosecutorial misconduct compels overturning of a defendant's conviction in accordance with the Fourteenth Amendment of the United States Constitution.

(Mullin Cert., Exhibit U, at 7–8).

After scrutinizing the facts and law presented to the state courts in this matter, the court concludes that Landano's federal claim was fairly presented to the state courts for purposes of exhaustion. It is not disputed that Landano set forth a claim that the prosecutor had suppressed exculpatory evidence in violation of his due process rights under *Brady v. Maryland, supra*. Thus, it is clear that the same method of analysis now propounded was readily available to the state courts.

As to whether the "substance" of the federal claim was asserted in the state courts, the government concedes that Landano has consistently contended in both state and federal courts that Forni committed the murder of Officer Snow. (Transcript of Oral Argument, at 32). But the government insists that "[t]o raise in a statement of facts that you believe that somebody else is the guilty individual does not cover every possible legal issue that could arise." (*Id.* at 33). The government does not fairly characterize either the scope or the significance of Landano's arguments that are set forth in his post-conviction petition brief. Landano did not merely say that *someone else* was guilty. Landano argued, *inter alia*, that (1) a particular person, Victor Forni, was the murderer; (2) Forni fit the description of eyewitnesses who saw the murderer; (3) the gun that killed Officer Snow was traced to Forni; (4) the prosecutor was under tremendous pressure to obtain a rapid conviction of the killer of Officer Snow; (5) Forni was successfully fighting extradition and was unavailable for immediate trial; (6) the prosecutor suppressed evidence that Forni was suspected of *active* involvement in other armed robberies carried out by the Breed; (7) the prosecutor pressured eyewitnesses into identifying Landano and made no record of several eyewitness identifications of Forni. In sum, Landano, with remarkable acuity under the circumstances, called the state court's attention to "a pattern ... that involves the most blatant violation of petitioner's constitutional rights." As set forth hereinafter, documents in the sole possession of the prosecutor and his investigators, concealed from Landano until this

court ordered that all files be opened for inspection, demonstrate a pattern of prosecutorial misconduct that indeed involves a blatant violation of Landano's constitutional rights. It is clear to this court that Landano asserted the substance of his federal claim in the state courts.

As to whether Landano presented both the legal theory and the supporting facts to the state court, it is unquestionable that he clearly articulated his legal theory. In his post-conviction brief, Landano explicitly relied upon *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and *Brady v. Maryland, supra,* to support his claim that the prosecutor had violated his constitutional rights. Landano cited *Simmons* with respect to his contention that the prosecutor had "grossly violated federal and state standards governing admissibility of eyewitness identification testimony." (Mullin cert., Exhibit R, at 95). Landano cited *Brady* with respect to his contention that the prosecutor suppressed evidence in violation of "long established federal and state norms governing the prosecutor's obligation to provide the Defense prior to trial with exculpatory evidence." *Id.* at 95, 83 S.Ct. at 1200. The lengthy excerpt from Landano's post-conviction brief, quoted *supra,* also presents the facts supporting his legal claim that the prosecutor suppressed exculpatory evidence (including evidence that tended to implicate Forni as the killer) in violation of his *Brady* due process rights. These facts clearly support Landano's legal theory that the prosecutor overreached and suppressed evidence in violation of his *Brady* due process rights.

It is true that Landano raised these constitutional claims of prosecutorial suppression without raising the facts that were recently discovered. The only remaining question is whether the submission of such additional facts in this court necessitates that Landano return to state court. The court concludes that such a return is not required because the newly-discovered facts do not alter Landano's federal claim; indeed they are completely consistent with his claim. Moreover, such a return would be grossly unfair because the facts supporting the renewed application for a writ of habeas corpus were themselves concealed by the government and not available for Landano to assert in the prior proceedings.

As this court reads the Supreme Court's decisions in this area, the manner in which new evidence is discovered or brought to a federal court's attention is noteworthy. For example, in *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963), the Court held that where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Although *Townsend* did not bear on the exhaustion issue, as correctly pointed out by the government, it is clear that the Court was disturbed that a crucial fact, known only to the government, was not disclosed at the state-court hearing. *Id.* at 321–22, 83 S.Ct. at 761. More recently, the Court held that evidence submitted at the direction of the district court did not fundamentally alter petitioner's claim that his indictment was invalid due to discrimination in the grand jury selection process. *Vasquez, supra,* 474 U.S. at 258, 106 S.Ct. at 620. The *Townsend* and *Vasquez* decisions both noted that the new evidence was not the result of the petitioner deliberately by-passing state proceedings. *Townsend, supra,* 372 U.S. at 317, 83 S.Ct. at 759; *Vasquez, supra,* 474 U.S. at 260, 106 S.Ct. at 621. Indeed, the *Rose* Court summed up its view of the exhaustion doctrine as follows:

> ... our interpretation of Sections 2254(b), (c) provides a simple and clear instruction to potential litigants: before you bring any claims to federal court, be sure that you first have taken each one to state court.

455 U.S. at 520, 102 S.Ct. at 1204. Landano followed this instruction as best he could; it cannot be said that he deliberately by-passed any state procedures. His failure to present the specific facts that are now before this court was not due to his own negligence or oversight; rather, the documents upon which such contentions

are based were in the sole possession of the prosecutor and his investigators. Indeed, he vigorously sought to obtain information in the possession of the prosecutor.

Moreover, this is not a case in which the state courts had no indication that the prosecutor had violated Landano's due process rights by suppressing exculpatory evidence. *See Bisaccia, supra,* at 311.[5] The state courts had an opportunity to consider Landano's claim of prosecutorial misconduct and were presented with the factual assertions from which Landano argued that such misconduct had occurred. Landano had no way to allege or demonstrate how widespread and well-hidden the misconduct was in this case. Notably, Landano sought to depose the prosecutor. It is quite possible that such a deposition would have led to the discovery of some of the errors of omission and commission that are set forth at length *infra.* Based on the factual assertions and discovery requests made by Landano, the state court could have been expected to offer Landano an opportunity to further substantiate his claim of prosecutorial misconduct such that the state could have adjudicated the claim.

Having determined that the issue of prosecutorial suppression of favorable evidence was fairly presented to the state courts, this court must also be satisfied that it may decide Landano's renewed habeas petition on the basis of the new evidence now before it. The government correctly points out that resolving the merits of Landano's petition requires a determination of whether exculpatory material was suppressed and if so, whether such suppression was material under *Brady.* The question is whether such a determination must be made in the first instance by the state courts. This court agrees with the analysis set forth by the Eighth Circuit in *Austin v. Swenson,* 522 F.2d 168, 170 (8th Cir.1975), *aff'd after remand* 535 F.2d 443 (8th Cir.1976), wherein the appellate court vacated the district court's dismissal on non-exhaustion grounds. The *Austin* court ruled that the district court should have resolved the petitioner's *Brady* claim upon the record developed in a federal evidentiary hearing, noting that newly disclosed police reports which exculpated the petitioner were not available to petitioner in the state proceedings. *Id.* at 170. The court observed that "a due respect for comity does not require that federal proceedings be halted each time the state produces additional evidence potentially favorable to the petitioner." *Id.* at 170 n. 5. In this case, it matters little that the newly-discovered material was disclosed without an evidentiary hearing. A federal determination is warranted because petitioner raised the general claim of prosecutorial suppression in the state courts previously and because exculpatory material was wrongfully withheld

5. Thus, this case is distinguishable from *United States ex rel. Trantino v. Hatrack,* 563 F.2d 86, 94 n. 17a (3d Cir.1977), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1499, 55 L.Ed.2d 524 (1978), wherein the exhaustion requirement was not met because the state courts "had *no* opportunity—let alone a fair one" to decide petitioner's *Brady* claim. In contrast to the *Trantino* decision, Landano clearly provided the state courts with an opportunity to decide his claim. This case is also distinguishable from *Pitchess v. Davis, supra,* 421 U.S. at 490, 95 S.Ct. at 1753, wherein the Supreme Court held that petitioner, after having previously obtained a conditional writ based on a *Brady* violation, had failed to exhaust with respect to the claim (that the underlying exculpatory material had been destroyed) which formed the basis for his application for an unconditional writ. In *Pitchess,* petitioner's federal unexhausted claim was presented to the state court in a pretrial motion, the denial of which the petitioner sought to review prior to trial by means of unsuccessful extraordinary writs filed in state appellate courts. *Id.* at 484, 95 S.Ct. at 1750. *Cf. Castille v. Peoples,* 489 U.S. ——, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989) (raising new claim only to state's highest court on discretionary review does not constitute fair presentation). In contrast to the *Pitchess* and *Castille* decisions, Landano raised his claim not in an extraordinary request for discretionary review but in consistent applications for post-conviction relief. *Pitchess* is further distinguishable from the present action in that the constitutional analysis regarding the destruction of evidence differs from the *Brady* analysis regarding the suppression of evidence. *See Arizona v. Youngblood,* —— U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Here, the court's review of the newly asserted facts does not involve a different legal standard, as all of the facts considered by the court are facts relating to the suppression of exculpatory evidence in violation of *Brady.*

643

by the prosecution throughout the state proceedings.

The exhaustion doctrine does not require that state courts be given more than one opportunity to consider federal habeas claims. Habeas Corpus Rules 7 and 8, respectively, provide for expansion of the record and for evidentiary hearings. Clearly, such rules contemplate that federal courts will often decide habeas cases on the basis of a record which includes materials that were not considered by the state courts, without undermining the policies served by the exhaustion doctrine. As the Third Circuit recently stated:

> State courts are certainly entitled to have the first opportunity to review federal constitutional challenges to state convictions.... There is no requirement, however, that they be given more than one opportunity to adjudicate these claims. [The petitioner] has given the state court their first opportunity, and they did not seize it.

*Keller v. Petsock*, 853 F.2d 1122, 1130 (3d Cir.1988) (citation omitted) (deeming that exhaustion requirement satisfied); *see also Jones v. Superintendent of Rahway State Prison*, 725 F.2d 40, 42 (3d Cir.1984) ("[o]ne such opportunity is sufficient"). In this case, the state courts had a fair opportunity to address Landano's claim of prosecutorial suppression and misconduct, and thus it is not necessary for Landano to now return to state court with additional facts in support of his claim.

 Furthermore, the nature of Landano's *Brady* claim distinguishes this case from most other exhaustion cases. Landano alleged throughout the state court proceedings that Forni was the actual killer and that the prosecutor had suppressed (1) evidence inculpatory with respect to Forni and (2) evidence exculpatory with respect to Landano. The unavailability of the specific facts that have now been uncovered was due to the prosecutor's suppression,

and Landano's request to confront the prosecutor at a post-conviction deposition was denied by the state court. Thus, the discovery of additional evidence supporting a consistent claim of prosecutorial suppression, when it brings to the federal court's attention exculpatory evidence that has been concealed, does not support a defense of non-exhaustion. *See United States ex re. Merritt v. Hicks*, 492 F.Supp. 99, 106 (D.N.J.1980) (comity not served by deferring determination of petitioner's *Brady* claim based on exculpatory police report discovered during federal habeas proceeding); *see also Monroe v. Blackburn*, 476 U.S. 1145, 1148–51, 106 S.Ct. 2261, 2263–65, 90 L.Ed.2d 706 (1986) (Marshall, J., dissenting from denial of certiorari) (forcing petitioner to return to state court upon discovery during federal habeas proceeding of suppressed *Brady* material "removes from the State any incentive to make timely disclosure of material, exculpatory evidence and trivializes the constitutional right recognized in *Brady* and its progeny").

 Given the factual contentions and legal claims presented to the state courts in this matter, this court concludes that the state courts were afforded a meaningful opportunity to consider Landano's allegations of legal error. Landano has satisfied the exhaustion requirement.[6] This court will address the merits of his petition.

### III. Merits of Landano's Petition

#### A. *Brady Doctrine.*

The basis for Landano's renewed application for habeas relief is his contention that the prosecutor suppressed exculpatory, material evidence in violation of his due process rights.

The Due Process Clause of the Fourteenth Amendment requires that criminal prosecutions comport with prevailing notions of fundamental fairness. This standard of fairness has been consistently in-

---

**6.** In light of the pattern of prosecutorial suppression of material, exculpatory evidence that has now been exposed after more than a decade, *see infra* at 646, this court also concludes that the exhaustion requirement should be excused in this case on the basis of "exceptional circum-

stances of peculiar urgency," *Rose, supra*, 455 U.S. at 515, 102 S.Ct. at 1202, and to prevent a "miscarriage of justice." *Granberry v. Greer*, 481 U.S. 129, 135, 107 S.Ct. 1671, 1674, 95 L.Ed.2d 119; *see also Monroe, supra*, at 1148–51, 106 S.Ct. at 2263–65.

terpreted by the Supreme Court "to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court examined the obligation of a prosecutor to disclose exculpatory information to a criminal defendant. The Court held that a defendant's due process right to a fair trial is violated when the prosecution withholds evidence that is both favorable to the accused and "material either to guilt or punishment." *Id.* at 87, 83 S.Ct. at 1197.

Under the *Brady* line of cases, a prosecutor is responsible for knowing what evidence appears in his or her files, even if such evidence has actually been overlooked. *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342; *State v. Carter,* 91 N.J. 86, 111, 449 A.2d 1280 (1982). The knowledge of a police officer investigating a crime is imputed to the prosecutor, *see Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and thus any materials found in police files which are favorable to plaintiff and material to his guilt or punishment should be turned over whether the prosecutor was aware of them or not.[7] *See Monroe v. Blackburn,* 476 U.S. 1145, 1149, 106 S.Ct. 2261, 2264, 90 L.Ed.2d 706 (1986) (Marshall, J., dissenting from denial of *certiorari*) ("[t]hat the information lay undisturbed in the files of the police and not those of the prosecutor should make no difference"); *see also State v. Carter,* 69 N.J. 420, 429, 354 A.2d 627 (1976) (where police officer was in charge of investigation and participated in trial of the case, his knowledge was imputable to the prosecutor); *Hall v. State,* 176 Ind.App. 59, 374 N.E.2d 62 (1978) (prosecution's files encompass all material within its control, including material located in files of police conducting investigation).

■ The obligation to turn over exculpatory evidence under *Brady* has been held not to have been violated where it was shown that the evidence was known to the defendant or to defense counsel. *See Hughes v. Hopper,* 629 F.2d 1036 (5th Cir. 1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1396, 67 L.Ed.2d 367 (1981). However, the defendant must have been aware of the *exculpatory nature* of the evidence as well as the mere existence of the evidence. *See, e.g., United States v. Griggs,* 713 F.2d 672 (11th Cir.1983) (per curiam). Thus, the fact that a defendant knew of the existence of a particular witness is not enough to preclude a finding of a *Brady* violation if any exculpatory statements given by the witness were withheld from the defense.

Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial, and the existence of such a probability would constitute constitutional error warranting reversal of a defendant's conviction. *United States v. Bagley,* 473 U.S. 667, 678–82, 105 S.Ct. 3375, 3381–84, 87 L.Ed.2d 481 (1985) (Blackmun, J., concurring). Thus, under *Brady,* a prosecutor is required to disclose that evidence favorable to the accused which, if suppressed, would deprive the defendant of a fair trial. *Carter v. Rafferty,* 826 F.2d 1299, 1304 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988). The *Brady* rule has been subsequently interpreted to include a duty on the part of the prosecution to disclose impeachment evidence as well as exculpatory evidence, since such evidence is favorable to the defendant and, "if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380.

■ In order to determine the "materiality" of a given piece of evidence, the

---

**7.** Thus, the court's use of the term "prosecutor" in this opinion does not necessarily refer to

Hudson County Prosecutor Thomas Mulcahy.

court must consider "the strength or fragility of the state's case against [the defendant] as a whole." *Carter*, 826 F.2d at 1308. As noted by the Supreme Court in *United States v. Agurs*, "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of minor importance might be sufficient...." 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976).

Having set forth the relevant standard of constitutional review, the court will next consider the factual assertions made by Landano in support of his request for habeas corpus relief.

B. *Factual Contentions Relating to Habeas Relief*

 1. Prosecutorial bad faith.

■ At Landano's trial, the prosecution relied on the testimony of four crucial witnesses: Jacob Roth, Allen Roller, Raymond Portas, and Joseph Pascuiti. The court has already concluded in its prior opinion that (1) a State agent involved in the prosecution of Landano made an impermissibly suggestive statement to Raymond Portas prior to his courtroom testimony; (2) the prosecutor suppressed information about co-defendant Allen Roller's additional criminal activities; and (3) the prosecutor suppressed information concerning a police investigation of Jacob Roth's business dealings. 670 F.Supp. at 577–88. In other words, this court has already determined that the prosecution either committed affirmative acts of misconduct or breached its *Brady* obligation with respect to three of the State's four key witnesses against Landano. In the instant application, it is further disclosed that the prosecutor did not turn over a police report which could have further impeached Roth, or a Hudson County Prosecutor envelope which memorializes an apparent eyewitness identification of Forni as the getaway car driver. (Mullin Cert., Exhibits E, I). There is no question that the record in this matter exposes a pattern of failures by the prosecution in

this case to live up to its good faith duty to turn over exculpatory information. This pattern supports the position asserted by Landano from the outset that the prosecution suppressed evidence exculpatory to him and inculpatory of Forni. Although the court recognizes that the good or bad faith of the prosecutor is irrelevant with respect to a *Brady* due process analysis, *see Brady*, 373 U.S. at 87, 83 S.Ct. at 1196, such considerations certainly are relevant to the credibility of the government's response to Landano's claims of suppression of particular items of evidence, which the court now addresses.

 2. First Ground Warranting Relief: Negative Identifications of Landano by Pascuiti and Calabrese.

Landano submits a handwritten document obtained from the Kearny police files. (Mullin Cert., para. 14, Exhibit O). The document lists the names of five individuals and reads as follows:

### ID on Landano

**Joe Pascuto—hair not right—suspect had curley hair**

Liloia
 BASF—nothing
Gorudine
 Rest. girl & Guy—
**J & B— younger looking**
**Calabrese Chris—coffee truck—hair not right—more curley**
Jack Roths statment page 3

(emphasis added).

Landano contends that this document was probably conveyed to the prosecutor and reflects the comments of at least two witnesses, Pascuiti and Calabrese, who viewed his photograph and said that Landano did not look like the perpetrator. Landano argues that the absence of any accompanying records supports an inference that the witnesses were improperly shown *only* Landano's photograph. Landano also notes that both Calabrese and Pascuiti described the perpetrator as having curly hair. Landano submits that both Calabrese and Pascuiti "are describing Victor Forni." (Plaintiff's Brief, at 8).

The government counters that the document does not purport to list identifications made in this case, but "appears to be handwritten notes made by an unknown individual regarding the identification evidence uncovered in the investigation." (Government Brief, at 21). As to Pascuiti, the government states that several reports available to defense counsel reflected that Pascuiti had made several inconclusive identifications. (*See* Government Exhibits 6, 16, 17). The government also highlights one statement by Pascuiti wherein the perpetrator is described as having hair that is "curly, fairly thick" (Government Exhibit 18). However, there is nothing in the record to demonstrate that this statement was turned over to defense counsel. In addition, the government points to the defense counsel's cross-examination of Pascuiti at trial, wherein Pascuiti testified that the perpetrator had curly hair. (Government Exhibit 19, at 100). The government submits that Pascuiti admitted on cross-examination that he had identified a photograph of Victor Forni in a photo display, and that defense counsel remarked that the photograph was of a man with curly hair. (*Id.*, at 101–103).[8]

In order to determine whether Landano's arguments are sufficient to establish a due process violation pursuant to *Brady* and its progeny, the court must first determine whether or not evidence favorable to Landano was suppressed by the government. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196. If the court concludes that suppression occurred, the court must then evaluate whether or not such evidence is material by determining whether, had it been disclosed to the defense, there is a reasonable probability that the outcome of Landano's trial would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (Blackmun, J., concurring).

### a) Suppression

■ Landano's *Brady* claim with respect to this asserted "negative" identifica-

tion of Landano by Pascuiti turns on whether the handwritten note in Exhibit O supports an inference that Pascuiti indeed was shown a photo of Landano by police investigators and rejected it. If this court were to infer that some other scenario could explain the basis for the "Pascuto" entry, thereby focusing only on the substance of Pascuiti's comments that the perpetrator had curly hair, the force of Landano's assertion would be blunted. Landano acknowledges that defense counsel was given an unsigned statement by Pascuiti indicating that the killer had curly hair. (Smith Cert., Exhibit F). The trial testimony confirms that defense counsel knew that Pascuiti had described the perpetrator as having curly hair. Thus, a first glance at the "Pascuto" entry by itself does not appear to suggest that the prosecutor's failure to turn this information over to Landano constitutes a *Brady* violation.

At this point, the other entries, particularly that of Calabrese, take on tremendous significance. As to the *substance* of Calabrese's reported comments in Exhibit O, Landano reiterates his contention that this information, if not material in itself, doubtless would have led to the discovery of material evidence. Landano points out that in none of the statements taken by Calabrese did he indicate that the suspect's hair was *curly*. The government reiterates its position that the record reflects that Calabrese identified a photograph of Forni and one of Landano, and that he was known to defense counsel as an identification witness for the state. Notably, the government does not argue that Landano was ever apprised that Calabrese had described the suspect as having curly hair. Nor does the government acknowledge that naming Calabrese as a potential witness for the prosecution, while withholding information that Calabrese had remarked that the suspect had curly hair, was at best misleading, and may have constituted a violation of Landano's due process rights. *See Griggs, supra*, at 674.

---

**8.** Although not mentioned by the government, the prosecutor immediately brought out, on redirect, that Pascuiti did not actually select any photograph from the display in question. (Government Exhibit 19, at 103).

If the substance of Calabrese's reported comments is disturbing, the *manner* in which they are transcribed is momentous. Exhibit O reads, in pertinent part, as follows: "ID on Landano.... Calabrese Chris—coffee truck—hair not right—**more curley.**" (emphasis added). The court cannot ignore the clear import of the words "more curley." Calabrese is not reported as having merely said that the suspect had curly hair. Calabrese is reported to have said the suspect had *"more* curley" hair, suggesting that he is comparing his recollection of the suspect to a *photograph.* Therefore, Exhibit O clearly supports an inference that Calabrese was shown a photograph of Landano and told an unknown government investigator that the man he served the morning of the crime had "more curley" hair.

The impact of the words "more curley" does not end with Calabrese, for it appears that at least one and perhaps two other witnesses "J & B," listed on Exhibit O, responded "younger looking," again suggesting a *comparison* with a photograph of Landano. What is most significant is the inclusion of Joseph Pascuiti on this list. The entries on Exhibit O support an inference that the document was prepared by an agent of the prosecution and that it memorializes the reactions of the witnesses listed to a photograph of Landano. Beyond the specter that the investigator(s) may have illegally confronted eyewitnesses with a single photograph of Landano [9] is the plain inference that Pascuiti was shown and rejected that photograph. The court concludes that the above inference is justified by the content of Exhibit O itself. It is clear to this court that Landano was not informed that Pascuiti had rejected his photograph. The court's conclusion that a negative identification of Landano by Pascuiti was suppressed by the government is further supported by the pattern of prosecutorial suppression of evidence exculpatory to Landano referred to *supra* at 646.

**9.** Identifications arising from single-photograph displays are viewed with suspicion, *see Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct.

#### b) Materiality

The government argues that because this handwritten note may not have been admissible at trial, the prosecutor cannot be deemed to have committed a *Brady* violation. *See United States v. Oxman,* 740 F.2d 1298, 1311 (3d Cir.1984) ("to be material, evidence suppressed must have been admissible at trial"), *vacated and remanded, United States v. Pflaumer,* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985) (in light of the Court's decision in *Bagley, supra* ), *on remand,* 774 F.2d 1224 (3d Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). However, it is not only the suppression of this note that implicates Landano's right to a fair trial; rather, it is the failure of the prosecution to make the negative identification known to Landano prior to his trial. Although the note found in the government's files (Exhibit O) may be all the proof that now remains, the clear inference from it is that several key witnesses were shown photographs of Landano and rejected them because the perpetrator's appearance differed from that of Landano. The prosecution's failure to disclose the substance of these negative identifications constitutes a suppression of evidence and deprived Landano of valuable exculpatory evidence. To hold otherwise would reward the prosecutor for failing to create or for destroying exculpatory evidence.

As noted *supra,* the court must evaluate the strength of the State's case against the defendant as a whole in order to determine the "materiality" of a given piece of suppressed evidence. *Carter,* 826 F.2d at 1308. The court prefaces its discussion of the materiality of the negative identification evidence by noting that consideration of the case against Landano "as a whole" necessarily includes the court's conclusions in *Landano,* 670 F.Supp. at 585, 588, regarding the suppression of evidence which could have impeached the testimony of Roller and Roth at trial.

967, 970, 19 L.Ed.2d 1247 (1968), since such procedures are bound to be suggestive.

In its prior opinion, this court noted that two witnesses testified that the killer of Officer Snow was also the driver of the getaway car. The prosecutor has already been found to have suppressed *Brady* material with respect to Allen Roller, one of those two witnesses. The court could not find a *Brady* violation, however, because there was a second witness, Pascuiti, who testified that the killer and driver were one and the same, and a third witness, Portas, who had identified Landano as the driver. Now, the record supports an inference that the prosecutor suppressed *Brady* material with respect to Pascuiti's negative identification of Landano which, in turn, calls into question the credibility of Portas' identification. Exhibit O clearly supports an inference that the prosecutor suppressed exculpatory evidence which would have supported Landano's affirmative defense that Forni was the murderer.

On direct examination, Pascuiti testified that, although he did not have a full face view of the perpetrator, he saw that the same dark-haired man who pointed the gun at Officer Snow drove the getaway car. (Smith Cert., Exhibit D, at 8.94, 8.96). On cross examination, Pascuiti testified that the perpetrator had short curly hair. (*Id.* at 8.100). Pascuiti also testified that he had picked a photograph of Victor Forni "as most resembling" the perpetrator. (*Id.* at 8.103). On re-direct examination, Pascuiti qualified this statement and testified that he had not selected any photographs from the display in question. (*Id.*).

Had defense counsel been apprised of the negative identifications reflected in Exhibit O, Pascuiti could have been confronted with his apparently negative identification of Landano. The defense could have used this information to argue to the jury that Pascuiti had ruled out Landano as the person who murdered Officer Snow and who drove the getaway car. If the jury accepted Pascuiti's prior rejection of Landano as the murderer and driver of the getaway car, the State's case against Landano unravels. The evidence at trial linking Landano to the crime consisted of the testimony of Portas, the truck driver who did not observe the murder and only testified as to the identity of the driver of the getaway car after it had left the scene of the crime, and the testimony of Roller and Roth. In its prior opinion, the court held that the suppression of evidence which impeached the testimony of Roller and Roth was not material in light of the other evidence linking Landano to the murder. That "other evidence" is now called into question, and thus the court's materiality determination regarding the suppression of impeachment evidence against Roller and Roth must also be reevaluated. Such impeachment evidence becomes material when considered in light of facts indicating that Pascuiti, the State's only witness to the shooting, may have ruled out Landano as the murderer.

Against the above backdrop, the court concludes that there is a substantial probability, in light of all the facts which came out at trial and which are now known to have been suppressed by the government, that the jury's verdict would have differed had Pascuiti's negative identification of Landano, in combination with the evidence tending to impeach Roller and Roth, been brought out at trial. Exhibit O thus provides grounds for this court to rule that the judgment of conviction in this matter is constitutionally infirm.[10]

In addition, the court concludes that there is a second, independent ground for habeas relief.

---

**10.** On habeas review, the role of this court is simply to determine whether petitioner's original trial satisfied the due process requirements of the federal constitution. Should Landano be retried, the unavailability of evidence suppressed by the prosecutor in the first trial is a matter for the state courts to address. *See Pitchess, supra,* 421 U.S. at 490, 95 S.Ct. at 1753 (federal courts do not maintain continuing supervision over retrial conducted pursuant to a conditional writ of habeas corpus). If, due to the passage of time or the failure to maintain government files, no other evidence of these negative identifications is available, it is for the state court in the first instance to determine (a) the admissibility of the handwritten note found in Exhibit O, and (b) the legal consequences of the government's failure to document and preserve the identification procedure and results referred to in the handwritten note.

### 3. Second Ground Warranting Relief: Basapas/Pasapas Identification of Forni.

■ As a separate ground in support of his request for habeas corpus relief, Landano submits a Kearny Police Department Continuation Report submitted by Detective Edward Rose, which contains the following entry, dated January 19, 1977:

> .... I then stopped at the Modern Transporttation [sic] and spoke to Joseph Pasapas [sic] who requested to see more pictures. He was shown the 17 picture spred [sic] #21529 to 21544 and he picked out #21532 Victor Forni as resembling the man who drove the car away. [sic] from the scene of the holdup on 8/13/76.

(Mullin cert., Exhibit H). One copy of this report was located in the Kearny Police Department files, and two copies were located in the Hudson County Prosecutor's files. (Mullin cert., para. 9). None of the files searched contained a photograph of Forni signed by Basapas/Pasapas[11] and there is no statement signed by Basapas/Pasapas. Landano argues that these circumstances demonstrate that such documents either were not created intentionally or they were later destroyed.

The government first contends that, regardless of its significance, this report was not suppressed. In support of this contention, the government offers the following: Several copies of the report were still found in the files of the prosecutor and the police department. One copy was discovered in the files of Victor Forni's defense attorney. A letter from Prosecutor Mulcahy to Landano's defense counsel indicates that Landano received supplemental discovery from the State on March 11, 1977. (Government Exhibit 5). This discovery included "Continuation reports from Kearny Police Department." According to the government, "it seems reasonable to infer" that the report was turned over to defense counsel before trial.

The government also relies on the proceedings at trial to support its belief that the Basapas/Pasapas Continuation Report was given to the defense. At oral argument, the government pointed out that four witnesses, all of whom are named in the Report, testified at trial that they had looked at photograph displays in January of 1977. (Transcript of Oral Argument, at 22–23). Landano's defense counsel did not bring to the trial court's attention that he had not been informed that such identification procedures had been conducted in January 1977. The government asserts that this silence on the part of defense counsel reflects that he did, in fact, have a copy of the Report. Moreover, defense counsel himself elicited from Joseph Pascuiti on cross-examination that he had viewed a photograph display in January 1977, supporting the government's contention.

The government next characterizes the identification in question as "tentative" since the report states that Forni "resembled" the driver of the getaway car. The government also disputes Landano's assumption that a photograph was signed or a statement was taken from Basapas/Pasapas, apparently arguing that no such action would be taken on the basis of a tentative identification.

Although conceding that neither Detective Rose nor Prosecutor Mulcahy recollects who Basapas/Pasapas is, (Rose Affidavit, para. 3, Government Exhibit 3; Mulcahy Cert., para. 7, Government Exhibit 1), the government submits that Joseph Basapas/Pasapas is in fact Joseph Pascuiti, who testified at trial. Prosecutor Mulcahy indicates that on a copy of the report located in the prosecutor's files, the word "Basapas/Pasapas" is apparently crossed out, with the word in his handwriting that appears to be "Pascuiti" inserted. (Government Exhibit 15; Mulcahy Cert., para. 7, Government Exhibit 1). Prosecutor Mulcahy, in an attempt to reconstruct an explanation for the insertion, speculates that he must have ascertained that the original entry of Basapas/Pasapas was a misspelling of Pascuiti. (Mulcahy Cert., para 7).

---

**11.** Because it is difficult to ascertain whether the first letter of the witness's last name is "P" or "B", the court will refer to the witness as "Basapas/Pasapas."

The government weakly offers an account of how the Basapas/Pasapas entry may have been created. Because no address or telephone number accompanies the entry, the government infers that Detective Rose had already taken down such information on a previous interview of Pascuiti. To explain how the word "Pascuiti" could be so mangled into "Basapas/Pasapas", the government guesses that Detective Rose must have been careless. (Transcript of Oral Argument, at 21). Detective Rose speculates that it might have been a typographical error. (Rose Affidavit, para. 4).

The government also suggests that Pascuiti's trial testimony mirrors the information contained in this report, arguing that "Pasapas, like Pascuiti, picked out Victor Forni as resembling the man who drove the car away from the scene of the holdup on August 13, 1976." (Government Brief, at 17). Further, the same photograph of Forni was selected by both Pascuiti and Basapas/Pasapas. (Transcript of Oral Argument, at 26).

In reply, Landano maintains that he never received a copy of the Kearny Continuation Report. (Mullin Cert., para. 24; Landano Cert., paras. 4–5). Landano rejects the government's contention that the Mulcahy letter of March 11, 1977 reflects that he was given a copy of the Basapas/Pasapas report. In so arguing, Landano relies on the fact that on March 30, 1977, an exhaustive document discovery list was given to defense counsel. (*Compare* Government Exhibits 5 and 6). This March 30 list includes more than thirty Kearny Continuation Reports, with references to dates, page lengths, and detectives who completed them. Notably, the list does not include the Basapas/Pasapas report or any report for 1977. Landano argues that the record supports his contention that neither he nor his counsel received any 1977 Kearny Continuation Reports. Landano notes that Prosecutor Mulcahy does not directly dispute this contention.

Landano also states that the word "resembling" in the report does not render the identification by Basapas/Pasapas tentative. Landano submits that when identifi-

cations were tentative, Kearny detectives so noted with clear language to that effect. The report at issue does not include any words of reservation.

Landano submits that the government's theory that Basapas/Pasapas is in fact Pascuiti results from the government's willful distortion of the record. First, Landano points out Pascuiti worked at Modern *Warehouse*, located at *42* Jacobus Avenue, whereas Basapas/Pasapas was interviewed at Modern *Transportation*, located at *75* Jacobus Avenue. (Robbins Cert., para. 2).

Second, Landano charges that the government has mischaracterized Pascuiti's trial testimony. Responding to the government's contention that the cross-examination of Pascuiti shows that defense counsel had been given the Report, Landano points out that defense counsel's attempt to establish that Pascuiti had selected Forni from a photo display was immediately rebutted by the prosecutor on re-direct, wherein he brought out that Pascuiti had *not* selected any photographs from the display. The Continuation Report at issue reflects that Basapas/Pasapas did in fact select a photograph of Forni. Thus, if Basapas/Pasapas is Pascuiti, Landano argues, the prosecutor suborned perjury on re-direct and concealed the fact that the only eyewitness to the murder had identified Forni as the killer.

If the state's theory is wrong, and Basapas/Pasapas is not Pascuiti, Landano then argues that the government has suppressed the statement of a heretofore unknown witness that would have directly rebutted Portas' claim that Landano drove the getaway car. Such evidence would constitute *Brady* material, Landano argues, the suppression of which warrants a reversal of his conviction.

Landano submits that "Basapas/Pasapas" is in fact Gus Lapas, who sold coffee from his truck along Jacobus Avenue in Kearny. Lapas often sold coffee at Modern Transportation, stopping there daily. On the day of the murder, Lapas' truck was almost hit by a car fleeing a crime scene. Lapas recalls going to the prosecutor's office to look at photographs of sus-

pects. Lapas' memory of the events is not good, and he does not recall whether he selected any photographs. (Lapas Cert., paras. 1–5, Exhibit F to Second Mullin Certification).

Landano notes that "Gus Lapas" has more letters in common with "Basapas/Pasapas" than does "Pascuiti". Landano also points out that Lapas stopped on a daily basis at Modern Transportation, which is named in Exhibit H, whereas Pascuiti was employed at Modern *Warehouse*. Landano also contends that no records in the government's files reflect that Lapas ever gave statements at the prosecutor's office, and he suggests that reports of interviews with Lapas, including Exhibit H, were suppressed. To counter the State's argument that Basapas/Pasapas is really Pascuiti, Landano argues that Pascuiti's testimony did not focus on the driver of the getaway car; rather, he described the actual shooting. On the other hand, Lapas, like Basapas/Pasapas, identified the *driver*. Landano suggests that Detective Rose might have *chosen* to misspell Lapas's name, to conceal his identity in the event Landano was acquitted so that Forni could later be tried as the actual triggerman.

### a) Suppression

Prior to considering the merits of the parties' arguments as to the identity of "Basapas/Pasapas", it is first necessary to address the issue of whether the Kearny Continuation Report labeled Exhibit H was turned over to defense counsel. The court's inquiry is somewhat hampered by the fact that Landano's trial counsel, Mr. Flynn, is deceased. However, both Neil Mullin, who has represented Landano for many years and certifies that he is familiar with discovery provided by the prosecutor in the state proceedings, (Mullin Cert., para. 24), and Landano himself, who has actively participated in his defense since his arrest, (Landano Cert., para. 2), certify that Exhibit H was not turned over to the defense. The government, which created this document, offers no record that specifically

states that Exhibit H was turned over but states that it "believe[s]" (Brief, at 43) that the Report is included in a list of documents turned over under cover of a March 11, 1977 letter by Mulcahy. (Government Exhibit 5). The prosecutor's letter, even if authentic, states only that unspecified Continuation Reports were turned over.[12] The prosecutor himself now has no recollection of the document, or whether it was even in his control, and he has no present recollection of any such witness by the name of Joseph Basapas. (Mulcahy Cert., para. 7). On the other hand, an exhaustive and detailed discovery list, which identifies with particularity such Continuation Reports, does not mention Exhibit H.

The court is not persuaded that the trial proceedings support the government's contention that the Report was not suppressed. First, the government concedes that none of the four witnesses selected Landano from any photograph array, *see* Transcript of Oral Argument, at 24, making it less likely that defense counsel would complain at the time of trial that he had never been notified of the photo arrays shown in January of 1977 with respect to those four witnesses. Second, one of the four witnesses who viewed photographs in January 1977 was a *defense* witness. *Id.* at 23. It is likely that defense counsel ascertained prior to trial that photographs had been shown at least to that witness, and inferred that photographs had been shown to other potential witnesses. Thus, defense counsel was on notice that the government had shown photographs to one witness in January 1977 and knew that Pascuiti had leaned towards a photograph of Forni in August 1976 and had stated that the killer had curly hair. (Landano Cert., para. 8). This lends credence to Landano's certification that defense counsel broached the topic of a January 1977 photograph selection of Forni by Pascuiti *without* the benefit of Exhibit H. Moreover, the fact that defense counsel did not confront Pascuiti with the Continuation Report

---

12. The fact that other materials identified in the Mulcahy letter may have been introduced at trial or were in the possession of defense coun-

sel does not establish that Exhibit H was among the Kearny Continuation Reports which may have been turned over.

on re-cross supports the contention that he did not have the report in his possession.

The record clearly supports an inference that Exhibit H was not turned over to the defense prior to or at trial. This conclusion is reinforced by the numerous instances, discussed *supra,* in which the prosecutor suppressed other exculpatory evidence or information.

### b) Materiality

Having carefully reviewed the record and the respective factual assertions and legal arguments of counsel, the court now assesses the significance of Exhibit H with respect to Landano's *Brady* claim. Landano has demonstrated that he was not apprised before trial that an eyewitness selected a photograph of Victor Forni as the driver of the getaway car and therefore as the actual killer of Officer Snow. The record does not establish whether the witness named in Exhibit H is in fact Joseph Pascuiti, Gus Lapas, or some other unknown individual. The lack of certainty regarding the identity of the witness is the fault of the government, and no one else. The government offers only strained inferences, and no proof, that Basapas/Pasapas is in fact Pascuiti. For example, the government's explanation for the Basapas/Pasapas entry that it was made on a follow-up interview of Pascuiti and that the misspelling was the result of carelessness is difficult to accept. The striking difference between "Pascuiti" and "Basapas/Pasapas" undermines Detective Rose's speculation that the error was typographical; a simple look at a typewriter's keyboard reveals the implausibility of such an explanation. Furthermore, it is almost inconceivable that the detective would not know, in January of 1977, five months after the murder, the correct name of the only witness who saw the murder. Conversely, the government has not proved that Basapas/Pasapas is *not* a person heretofore unknown to the defense.

The significance of Exhibit H is clear, regardless of the actual identity of "Basapas/Pasapas". If the person or persons named in the documents are *not* Joseph Pascuiti, then the prosecutor concealed the fact that a heretofore unknown witness identified Victor Forni as the driver of the getaway car. This evidence would have directly rebutted Raymond Portas' testimony that Landano was the driver. Therefore, if Basapas/Pasapas is not Pascuiti, then there is a reasonable probability that the outcome of Landano's trial would have been different because the jury would have been faced with conflicting testimony regarding the identity of the driver. This testimony, combined with the wrongfully suppressed impeachment evidence against Roller and Roth, was material to Landano's defense and could have rebutted the State's case against Landano.

If the person named in Exhibit H *is* Joseph Pascuiti, then the state suppressed information that would have assisted in the defense's attempt to attack Pascuiti on cross-examination. The court's review of the transcript supports a clear inference that defense counsel was not privy to the fact that Pascuiti had selected a photograph of Forni. Defense counsel elicited a tentative admission that Pascuiti had selected such a photo, but was unable to counter the prosecutor's immediate re-direct establishing that Pascuiti had not in fact selected a photo of Forni. Had Exhibit H been available to the defense, defense counsel would in all likelihood have confronted Pascuiti with the Continuation Report which reflects that the eyewitness actually selected a numbered photograph of Victor Forni as resembling the driver of the getaway car. The prosecutor's failure to provide this report crippled the defense's attempt to establish that Forni was the actual killer. Therefore, if Basapas/Pasapas *is* Pascuiti, then the court also concludes that there is a reasonable probability that the outcome of Landano's trial would have been different.

Regardless of the identity of the eyewitness named in Exhibit H, the prosecutor's failure to disclose or turn over this document constituted a violation of Landano's right to due process of law and de-

prived him of a fair trial.[13]

CONCLUSION

■ Having made an exhaustive review of the applicable law and existing facts in this matter, the court deems it appropriate to comment on the human factors here at stake. Concerns of compassion and humanity may not be appropriate in determining whether or not the court has the obligation to defer to the state court and require the petitioner to submit his claims there in the first instance. However, petitioner's incarceration for more than a decade, coupled with the distinct possibility that he, indeed, may be innocent of the charges for which he was convicted, are additional considerations supporting the relief granted herein. Requiring him to return to the state courts and start the process of review again would be unduly cruel and insensitive.

The court in this opinion has walked the path of existing authority and visited the historical precedents which, it respectfully submits, allow the action which it now takes, and which permit it to conclude that petitioner is entitled to immediate, not eventual, relief from the constitutional wrongs committed against him. Compassion may have no role in interpreting the law in our system of justice, but there can be no justice without it.

For the above reasons, this court will grant Landano's motion to vacate its order of September 29, 1987, which denied Landano's petition for habeas corpus relief. The court will grant Landano's petition and will issue a conditional writ of habeas corpus directing respondents John J. Rafferty, Superintendent of the East Jersey State Prison, and the State of New Jersey to release plaintiff Vincent James Landano from custody unless plaintiff is afforded a new trial to commence within 90 days of the date of the issuance of the writ.[14]

---

**13.** In light of the court's conclusion that each of the two aforementioned constitutional violations requires that the writ be granted, it is not necessary to discuss in detail the other issues raised in Landano's petition. These other contentions refer to (1) a "Property and Evidence Report," listing a photograph of Victor Forni, which was stapled to a statement by Raymond Portas; (2) a Newark Police report reflecting that Jacob Roth was questioned about possible payments to Officer Snow; (3) a handwritten note listing an identification of Forni by a witness named "Papasavas"; (4) photographs and statements signed by Christopher Calabrese; (5) a Hudson County Envelope memorializing a identification of Forni as the getaway car driver; and (6) materials no longer maintained in the prosecutor's files. Although several of these contentions are relevant to the issue of prosecutorial bad faith, the court concludes that none serves as an independent basis for this court to void Landano's conviction on constitutional grounds.

**14.** Any application for release pending appeal or retrial should be made, in the first instance, to the state courts. If no action is taken within 30 days of said application, this court will entertain petitioner's application for enlargement under Fed.R.App.P. 23.